# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                             Case No. 17-30961-WRS

                                                  Chapter 7

TIMOTHY THOMAS MCCALLAN,

      Debtor.

## MEMORANDUM DECISION

This matter came before this Court on November 8 and 9, 2018 for an evidentiary hearing on Trustee Carly Wilkins' Objection to Debtor's Claim of Exemptions (Doc. 51). For the reasons set forth below, the Trustee's Objection is sustained in part and overruled in part.

## I. FACTS

### A. Procedural Background

The Debtor, Timothy Thomas McCallan, commenced this case on November 18, 2016, filing a voluntary petition under Chapter 7 in the Middle District of Florida.[1] McCallan's Chapter 7 case was transferred to this District on March 30, 2017, pursuant to Fed. R. Bankr. P. 1014(b).

---

[1] The Middle District of Florida Bankruptcy Court assigned it Case No. 16-7524.

(Docs. 61-62). McCallan first filed a Schedule C claim of exemption on December 9, 2016. (Doc. 13). An Amended Claim of Exemption was filed on June 23, 2017. (Doc. 178). An Evidentiary Hearing on the Trustee's Objection was held on November 8-9, 2018. (Doc. 282). On January 10, 2019, the Court entered an "Order: (1) Denying Debtor's Motion to Pay College Tuition; (2) Deferring Ruling on Trustee' Objection to Debtor's Claim of Exemption; and (3) Denying Trustee's Motion to Strike." (Doc. 294). In the January 10, 2019 Order, the Court stated that "[w]hen this Court hears *Wilkins v. Jeanne McCallan*, Adv. Pro. 18-3084, it will reopen evidence on the Trustee's Objection to Claim of Exemption. At that time, Timothy McCallan may offer such evidence as he finds appropriate, subject to the Trustee's right to cross-examine, or offer further evidence of her own." (Doc. 294, p. 3).

At the time this Court entered the January 10, 2019 Order, it was of the view that Adv. Pro. 18-3084 would be tried in this court. After entry of that Order, Jeanne McCallan filed an Answer demanding a jury trial (Adv. Pro. 18-3084, Doc. 20) and a Motion for Withdrawal of the Reference. (Adv. Pro. 18-3084, Doc. 22). In response to that motion, the District Court denied the motion to withdraw the reference and ordered this Court to conduct discovery and pretrial proceedings in Adv. Pro. 18-3084. (Case No. 19-MC-3854, Order entered March 18, 2019) (Watkins, D.J.). The District stated that "Defendant's right to a jury trial is deemed preserved." *Id.* at 3. In light of these developments, it does not appear to be advisable to delay ruling on the Trustee's Objection any longer.

-2-

## B. A Brief History of Proceedings

This case comes with a long history, which will be briefly summarized here.[2] For greater detail, one may read this Court's Memorandum Decision entered on February 16, 2016, in Adversary Proceeding 11-3007 at in *Wilkins v. AmeriCorp Inc., et al.*, 545 B.R. 675 (Bankr. M.D. Ala. 2016). Adversary Proceeding 11-3007 resulted in a money judgment against McCallan in the amount of $102,949,220.72. After entry of the money judgment against McCallan, the Trustee began proceedings in an effort to collect the judgment. After considerable proceedings were had, McCallan was found in contempt of court for failing to comply with Orders from this Court to respond to Trustee's requests for discovery and to turn over the ill-gotten gains from his fraudulent debt settlement scheme, and later jailed. On September 16, 2019, this Court handed down a Memorandum Decision denying one of McCallan's attempts to free himself from incarceration for contempt of court. (11-3007, Doc. 818) *Wilkins v. AmeriCorp Inc., et al.*, Adv. Pro. No. 11-3007-WRS, 2019 WL 4411822 (Bankr. M.D. Ala. Sept. 16, 2019). An earlier decision concerning McCallan's contempt may be found at *Wilkins v. AmeriCorp, Inc., et al.*, Adv. No. 11-3007, 2018 WL 2373639 (Bankr. M.D. Ala. May 23, 2018). McCallan has prosecuted several appeals to the

---

[2] The first exposure this Court had to McCallan's activities was in *In re Nelms*, Case No. 10-30430. The *Nelms* filing triggered two additional filings: *In re Allegro Financial Services, LLC*, Case No. 10-30630, and *Allegro Law, LLC*, Case No. 10-30631. The Trustee in *Allegro Law*, brought suit against McCallan and several related entities for long list of depredations, resulting in a money judgment against McCallan for more than $102,949,220.72. *Wilkins v. AmeriCorp, et. al.*, Adv. Pro. 11-3007. Also of note, Chase Bank brought suit against Nelms for fraud arising out of this scheme, resulting in a nondischargeable money judgment against Nelms for more than $10,000,000. *Chase Bank v. Nelms*, Adv. Pro. 10-3042. The gist of suit in *Chase Bank v. Nelms* as well as in *Wilkins v. AmeriCorp*, was that McCallan's debt management and debt consolidation business was a massive fraud perpetrated on thousands of victims resulting in the loss of many millions of dollars, much of which found its way into McCallan's control. It is the proceeds of these ill gotten gains which is the subject of these proceedings.

District Court. The decision with the most detailed discussion of the case was handed down by the District Court on March 19, 2018. *McCallan v. Wilkins*, Case No. 2:18-CV-117-WKW, 2018 WL 1384107 (M.D. Ala. Mar. 19, 2018).

### C. McCallan and the Debt Settlement Schemes

For many years, McCallan was in the debt settlement and debt management business.[3] He would advertise on mass media seeking to help consumers who found themselves unable to pay their credit card debt and other debts. The consumer would call a toll-free telephone number and speak with a telemarketer posing as a debt settlement counselor. After providing the counselor with his information, the consumer would be put in a program which, they were told, would take care of their debts. They had only to make one monthly payment, usually by bank draft, and McCallan and his confederates would take care of the rest. While the program may have sounded like a godsend to the financially beleaguered but trusting consumer, the reality was disastrous for the consumer. Virtually none of the money paid by the consumers was paid over to creditors. The lion's share of the money paid over by consumers ended up in the pockets of McCallan and his conspirators, leaving the consumers worse off than when they started.

The Alabama arm of this fraudulent hydra was called Allegro Law, which was ostensibly owned and operated by an Alabama lawyer named Keith Nelms, who had no prior experience in

---

[3] The Court speaks in the past tense here, focusing on what it has learned about McCallan's business throughout a mass of litigation. However, evidence adduced in several evidentiary hearings during the pendency of McCallan's incarceration suggests that he may still be in some form of his illegal business, using confederates to act on his behalf, consistent with his past practice, yet constantly evolving to meet the challenges posed by the Trustee's relentless efforts to recover these ill gotten gains for the benefit of creditors.

debt management.[4] *Wilkins v. AmeriCorp Inc., et al. (In re Allegro Law, LLC)*, 545 B.R. 675, 697 (Bankr. M.D. Ala. 2016). In reality, McCallan controlled Allegro using Nelms as a "front" for the fraudulent debt settlement scheme. *Id.* at 698. Soon after the creation of Allegro, "Nelms ostensibly 'hired' McCallan and his entities, AmeriCorp and Seton, to handle back-office processing for Allegro." *Id.* at 683 (citing *Chase Bank USA, NA, et al. v. Nelms (In re Nelms)*, Adversary No. 10-3042-WRS, 2014 WL 3700511, *3-4 (Bankr. M.D. Ala. July 24, 2014)). McCallan, by and through his associates, "fronts," and business entities, orchestrated a massive debt settlement scheme across multiple states and under multiple guises. Before doing business in Alabama, a prior iteration of the same scheme, on a somewhat larger scale, took place in Florida and was "fronted" by the Hess-Kennedy law firm. *AmeriCorp*, 545 B.R. at 682. In 2008, the State of Florida took action against the Hess-Kennedy firm, so McCallan shifted his operations away from Hess-Kennedy and moved the ground-level operations to Alabama. *Id.* at 683.

Under the scheme, "victims signed up under the belief that they would be represented by an attorney, Nelms, and that he would negotiate a settlement with their creditors (usually credit card companies)." *Id.* The unsuspecting victims, under the orders of Nelms, would stop sending payments to their creditors; instead, they would pay Allegro, oftentimes through recurring

---

[4] The immediate predecessor to the Alabama arm was headed by Laura L. Hess in Florida. She did business under several names, including Laura Hess & Associates, P.A..; Hess Kennedy Chartered, LLC; and The Consumer Law Center, LLC. Allegro Law, the Alabama arm was a successor to the Florida entities named above. An interesting post script to this is that Laura Hess was disbarred by the Florida Bar for her activities fronting for McCallan. Keith Nelms was suspended for three years by the Alabama Bar, many years ago, and has not been reinstated. Alabama lawyer Thomas McAlpine, who engaged in a pattern of over the top antics on behalf of McCallan in Adversary Proceeding 11-3007, has been disbarred by the Alabama Bar. McCallan has a long history enticing lawyers to do his unlawful bidding and then leaving them either suspended or disbarred.

automatic payments, on the belief that Nelms would ultimately negotiate a settlement on their behalf with the funds paid to, and held by, Allegro. *Id*. Ultimately, their money was destined for McCallan's pocket because "McCallan charged Allegro's customers massive up-front hidden fees for merely holding their money, sent a portion of the collected fees to Nelms, some to other confederates such as the telemarketers who 'sourced' the customers, and pocketed the rest." *Id*. The District Court described this scheme as "personal economic suicide" for the victims of the Allegro fraud. *McCallan v. Hamm*, No. 2:11-cv-784-MEF, 2012 WL 1392960 *3 (M.D. Ala. Apr. 23, 2012). With a warning from the State of Florida, the State of Alabama learned of the nefarious activities of Allegro Law, and forced Allegro into receivership, which, in turn, caused Nelms to file a voluntary chapter 7 bankruptcy petition in 2010. *AmeriCorp*, 545 B.R. at 683. Nelms' bankruptcy trustee, Daniel Hamm, then placed Allegro Law and Allegro Financial in their own chapter 7 bankruptcies. *Id*.[5]

Hamm, as trustee for Allegro Law, filed an adversary proceeding against Timothy McCallan, AmeriCorp, and Seton, in which he "sought turnover of estate property (Count I), avoidance of preferential transactions (Count II), avoidance of post-petition transfers (Count III), avoidance of fraudulent transfers (Count IV), and an accounting of the fees the Defendants collected (Count V)." *AmeriCorp*, 545 B.R. at 684 (referencing Case No. 11-03007, Doc. 6). As this Court noted:

---

[5] Hamm was also appointed as bankruptcy trustee for Allegro Law, case no. 10-30630, and Allegro Financial, case no. 10-30631. After Hamm's retirement, Wilkins succeeded Hamm in his capacity as trustee in both cases.

Case 17-30961    Doc 364    Filed 05/07/21    Entered 05/07/21 16:26:52    Desc Main
Document    Page 6 of 42

This is an extraordinary case of fraud on a massive scale that was perpetrated by Defendant Timothy McCallan ("McCallan") on thousands of victims. McCallan masterminded a debt settlement scheme in which customers were enticed into handing their money to entities controlled by McCallan with a promise that their debts would be either paid or settled. Thousands of customers signed up for debt settlement services offered by McCallan and paid him more than $100,000,000. Almost none of the money was paid to creditors of the customers as promised by McCallan. Instead McCallan, and those in league with him, siphoned off the money into a vast array of companies controlled by or closely associated with him. Among these entities were McCallan's co-defendants: AmeriCorp, Inc. ("AmeriCorp") and Seton Corp. ("Seton").

McCallan used attorneys as a "front" to perpetuate his scheme and to provide it an air of legitimacy. McCallan's scheme was most recently fronted by Keith Nelms ("Nelms"), an Alabama attorney whose license has since been suspended for his many unethical activities.2 Allegro Financial and Allegro Law (collectively "Allegro") were instrumentalities controlled by McCallan and fronted by Nelms as a law firm. Prior to Nelms, McCallan's front was Laura Hess, a Florida attorney who was disbarred for actions she took while fronting a previous iteration of McCallan's debt settlement scheme, a law firm called Hess–Kennedy.

From the viewpoint of the customer, or victim, McCallan's scheme began with mass media advertising—television, radio, billboards, etc.—designed to appeal to those in financial distress. The potential customer could call a toll-free number and speak with a representative who would then sign the customer up, promising him that his financial worries would be over. The representative would promise the customer that they would deal directly with his creditors, that all the customer would have to do is pay his money to them instead of his creditors, and that they would take care of the rest. Instead, the customer's money would be siphoned off under the guise of hidden fees and costs, the customer would be that much poorer, and he would default on his debts because his creditors would go unpaid. As the District Court has aptly noted, the effect of

McCallan's debt settlement scheme on its victims was "personal economic suicide[.]" *McCallan v. Hamm*, 2012 WL 1392960, *1, 2012 U.S. Dist. LEXIS 56097, *3 (M.D. Ala. Apr. 23, 2012). This adversary proceeding is an attempt by the Trustee in bankruptcy to recover the money *that McCallan defrauded from these victims.*

*AmeriCorp*, at 681-82 (emphasis added).

After five arduous years fraught with myriad deceptions, deceit, and delays engineered by McCallan, this Court entered a default judgment against Timothy McCallan, AmeriCorp, and Seton for $102,949,220.72 based on the claims filed by 5,412 victims of the Allegro fraud. *Id.* at 711. After all of this contentious litigation, multiple interlocutory appeals, and numerous attacks by McCallan on the integrity of the Court and the Trustee, neither McCallan nor his lawyer appeared at the trial–notwithstanding the fact that only one week prior, his lawyer appeared for a pretrial hearing, argued a motion for summary judgment, and moved to recuse the undersigned as judge. McCallan's lawyer was later disbarred by the Alabama Bar for a long list of shenanigans played out in this Court.

### D. The Trustee's Collection Activities and McCallan's Contempt

In the aftermath of the judgment against McCallan, AmeriCorp, and Seton, Wilkins sought post-judgment discovery against McCallan in order to facilitate a recovery of assets. (Case No. 11-03007, Docs. 372 & 373). McCallan repeatedly refused to comply with Wilkins' post-judgment discovery, which resulted in a protracted string of motions, orders, and memoranda[6]:

---

[6]All document numbers indicated reflect the document numbers in Adv. Pro. Case No. 11-3007.

Case 17-30961    Doc 364    Filed 05/07/21    Entered 05/07/21 16:26:52    Desc Main
Document    Page 8 of 42

| | | |
|---|---|---|
| 09/26/2016: | Doc. 391 | Order for Timothy McCallan to Appear and Show Cause why he should not be held in contempt |
| 10/06/2016: | Doc. 396 | Order Finding Timothy McCallan in Contempt. |
| 07/19/2017: | Doc. 569 | Plaintiff's Third Motion for Sanctions against Timothy McCallan for failing to comply with discovery |
| 08/22/2017: | Doc. 572 | Order for Timothy McCallan to appear and show cause why he should not be held in contempt. |
| 10/24/2017: | Doc. 583 | Order Finding Timothy McCallan in Direct Civil Contempt and Ordering him held in Custody until Further Order of this Court. |
| 11/07/2017: | Doc. 588 | Order requiring Timothy McCallan to promptly provide plaintiff with all information needed to access the documents provided via DropBox and warning against any "eleventh hour" document dumps. |
| 01/16/2018: | Doc. 618 | Order setting evidentiary hearing on January 30, 2018 regarding Timothy McCallan's compliance with plaintiff's discovery requests. |
| 02/06/2018: | Doc. 629 | Order clarifying the requirements for Timothy McCallan to purge himself of contempt. |
| 03/20/2018: | Doc. 693 | Memorandum Opinion authored by United States District Judge W. Keith Watkins. |

| 05/23/2018: | Doc. 707 | Memorandum Opinion authored by United States Bankruptcy Judge William R. Sawyer. |
| 10/02/2018: | Doc. 771 | Order Governing Defendant Timothy McCallan's Efforts to Purge Himself of Contempt |
| 11/05/2018: | Doc. 774 | Memorandum Opinion authored by United States District Judge W. Keith Watkins. |
| 11/15/2018: | Doc. 780 | Order on Hearing held November 8, 2018. |
| 01/11/2019: | Doc. 790 | Order for Hearing on Defendant Timothy McCallan's Motion to Determine Compliance. |
| 09/17/2019: | Doc. 818 | Memorandum Opinion authored by United States Bankruptcy Judge William R. Sawyer. |
| 09/26/2019: | Doc. 822 | Motion to Set Hearing filed by Timothy McCallan |
| 11/14/2019: | Doc. 855 | Memorandum Opinion authored by United States Bankruptcy Judge William R. Sawyer. |
| 11/14/2019: | Doc. 856 | Order Denying Motion for Immediate Release of Inmate |
| 03/25/2020: | Doc. 891 | Order of Immediate Release |

The Memorandum Opinion of this Court on May 23, 2018 stated that "[u]ntil [McCallan] discloses all of his property and turns over his ill-gotten gains, he remains in contempt." Further, in the October 2, 2018 Order, this Court cautioned McCallan that his "efforts in the future should

be geared towards returning his ill-gotten gains to the Trustee so that she can distribute them to McCallan's many victims. Once the money is turned over, the Court will release McCallan." Case no. 11-3007, Doc. 771. While McCallan is no longer incarcerated for his refusal to comply with Wilkins' discovery requests, he remains in civil contempt.[7]

### E. Facts Pertaining to the Debtor's Claims of Exemptions

Turning to the matter before the Court, the Debtor seeks to exempt a substantial portion of his assets, including his residence in Brevard County, Florida, its contents, his children's 529 College Savings Plans, his Roth IRA, an irrevocable family trust, bank accounts, and the cash value of certain life insurance policies from the Chapter 7 Trustee under Florida common law, the Florida Constitution, and Florida statutory exemptions. (Docs. 13 & 178). The Debtor and his non-filing spouse, Jeanne McCallan, contend that they own the Florida Home as a tenancy by the entirety.

Debtor has also claimed a homestead exemption under Art. X Sec. 4 of the Florida Constitution. Wilkins, in her capacity as trustee for the Allegro bankruptcies and judgment creditor of McCallan, filed an Objection to Debtor's Claim of Exemptions (Docs. 46 & 51) on the ground that the Debtor is ineligible for Florida exemptions due to domiciliary restrictions. The Debtor claims that he and his family relocated from New York to Florida prior to the start of the 2014 academic year, and, thus, more than 730 days before he filed this bankruptcy case. The

---

[7] McCallan was released from custody due to the COVID-19 pandemic and not as a result of having purged himself of contempt. McCallan remains in contempt and is yet under a duty to cooperate with the Trustee and turn over his ill-gotten gains.

Trustee contends that the Debtor was not domiciled in Florida until sometime in 2015, well within the 730 days preceding the filing of this case.

The Debtor has twice sought to harvest funds from his three 529 College Savings Plans in order to pay college tuition for his children. Docs. 146, 245. This request was first set for an evidentiary hearing evidentiary hearing on June 27, 2017, but was subsequently continued to a telephonic hearing until August 15, 2017, the same time as the telephonic hearing on Trustee's Objection to Debtor's Claim of Exemptions. The joint hearing was continued to October 23, 2017, then to November 6, 2017, then to November 16, 2017, then reset to a January 9, 2018 telephonic status hearing, then finally set for a final evidentiary hearing on both the Trustee's Objection to Debtor's Claim of Exemptions and the Debtor's Motion to Allow Payment of College Expenses on November 8 and 9, 2018. The cause of the delay was Debtor's failure to timely comply and respond to Trustee's discovery requests in this case and in 11-3007. On January 10, 2019, the Court denied Debtor's Motions to Pay College Tuition and took the matter of the Trustee's Objection to Claim of Exemptions under advisement.

## II. Law

### A. Jurisdiction

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334(b) and the District Court's General Order of Reference dated April 25, 1985. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). This is a final order.

-12-

## B.  Property of the Estate and Exempt Property

The filing of a petition under Chapter 7 of the Bankruptcy Code, creates an estate, which "consists of all the interests in property, legal and equitable, possessed by the debtor at the time of the filing, as well as those interests recovered or recoverable through transfer and lien avoidance provisions." 11 U.S.C. § 541(a); *Owen v. Owen*, 500 U.S. 305, 308 (1991).  In Chapter 7 cases, a trustee is appointed to marshal the assets of the debtor's estate, liquidate the non-exempt assets, and distribute the proceeds to creditors.  *See* 11 U.S.C. §§ 704(a)(1); 726.

In order to allow the debtor to maintain sufficient assets to achieve the "fresh start" envisaged by the Bankruptcy Code, a debtor may elect to exempt certain property from the bankruptcy estate.  11 U.S.C. § 522(b)(1); *see also Owen*, 500 U.S. at 308 ("An exemption is an interest withdrawn from the estate (and hence from the creditors) for the benefit of the debtor."). The effect of an exemption is that "[p]roperty that is properly exempted under § 522 is (with some exceptions) immunized against liability for prebankruptcy debts." *Owen*, 500 U.S. at 308.

Unless the debtor's state of domicile has "opted out," a debtor has a choice of federal exemptions under § 522(d) or exemptions under state law of the debtor's domicile.[8] 11 U.S.C. § 522(b)(1).  If the debtor elects, or is restricted to, state law exemptions, a debtor may only claim

---

[8] Florida is an "opt out" state:

> In accordance with the provisions of [§] 522(b) of the Bankruptcy Code of 1978 (11 U.S.C. [§] 522(b)), residents of this state shall not be entitled to the federal exemptions provided in [§] 522(d) of the Bankruptcy Code of 1978 (11 U.S.C. [§] 522(d)).  Nothing herein shall affect the exemptions given to residents of this state by the State Constitution and the Florida Statutes.

FLA. STAT. ANN. § 222.20.

the exemptions of the state "in which the debtor's domicile has been located for the 730 days preceding the date of the filing of the petition." 11 U.S.C. § 522(b)(3)(A). In the event that the debtor was not domiciled in a single state for the entire 730 days, the debtor's exemptions are limited to the laws of the state "in which the debtor's domicile was located for the 180 days immediately preceding the 730-day period or for a longer portion of such 180-day period than in any other place." *Id*.

If a debtor is then unable to assert a claim of exemptions under state law due to the limitations of § 522(b)(3)(A), then the debtor may claim federal exemptions under 522(d) even if the debtor's last state of domicile is an "opt out" state. 11 U.S.C. § 522(b)(3) (hanging paragraph).

Once a debtor has asserted a claim of exemptions, a party in interest may object to the debtor's exemptions. FED. R. BANKR. P. 4003(b). An objecting party bears the burden of proving, by a preponderance of the evidence, that the debtor is not entitled to the claimed exemptions. *In re Mohammed*, 376 B.R. 38, 41 (Bankr. S.D. Fla. 2007); *see also* FED. R. BANKR. P. 4003(b)(c).

## C. McCallan is not entitled to claim Florida exemptions because he was not domiciled in Florida for 730 days preceding the date of his petition in bankruptcy

In order to establish whether the Debtor can avail himself of Florida exemptions, "the Court must determine whether the Debtor['s] domicile was continuously located in Florida for the two years immediately preceding" the filing of his petition on November 18, 2016. *In re Welton*, 448 B.R. 76, 80 (Bankr. M.D. Fla. 2011). For the purposes of 11 U.S.C. § 522(b)(3)(A), the domicile of the debtor "is established 'by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there.'" *In re Lordy*, 214 B.R. 650, 662 (Bankr. S.D. Fla.

-14-

1997) (quoting *In re Hodgson*, 167 B.R. 945, 950 (D. Kan. 1994)). In order to determine when, and if, Debtor established his domicile in Florida, the Court must weigh several factors, including:

> current residence; voting registration and practices; location of spouse and family; location of personal and real property; location of brokerage and bank accounts; memberships in churches, clubs, and other organizations; location of the person's doctors, dentist, accountant and lawyers; place of employment or business; driver's license and automobile registration; and payment of taxes.

*In re Lordy*, 214 B.R. at 662 (citing *District of Columbia v. Murphy*, 314 U.S. 441, 457-58 (1941)).

While the Debtor is certainly in the best position to testify about his own intentions, the Supreme Court has cautioned that

> One's testimony with regard to his intention is of course to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts.

*Murphy*, 314 U.S. at 456.

Despite Debtor's testimony that he and his family relocated from New York to Florida sometime before the start of the 2014 academic year, his actions belie his statements. It is undisputed that McCallan resided in and was domiciled in New York for many years prior to 2016. (Doc. 262, p. 21) (Tr. Nov. 8, 2018). On April 5, 2004, he and his wife Jeanne purchased a home in Melbourne, Florida. (Defendant Exhibit 4). At the time they purchased the home, they were residing in Northport, New York. The Florida home was used as a vacation home which the McCallan and his family visited frequently in the following years.

-15-

Debtor and his wife sold the New York Home in September of 2016. After the closing of the sale, they signed and executed a "Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from the Payment of Estimated Personal Income Tax" in the state of New York. Exhibit 450A. Page four of this return contained the following declaration: "If you are a New York state resident, transferor/seller listed in Schedule A, you must sign below." *Id*. The return further states that "[t]his is to certify that at the time of the sale or transfer of the real property or cooperative unit the transferor/sellers, as signed below, was a resident of New York state, and therefore is not required to pay estimated personal income tax under tax law, section 663(a) upon the sale or transfer of this property or cooperative unit." *Id*. The Debtor and his wife signed the signature block labeled "Part 1, New York state residents." *Id*. While the Debtor claims he was an "innocent mistake" in his rebuttal brief, the Court is not convinced; time and again, the Debtor has shown to be intelligent and quite calculated in his actions.

Additionally, just as Debtor's actions have repeatedly shown to be calculated steps, his inactions carry the same weight of deliberation and decision. The Trustee introduced evidence relating to the property tax history on Debtor's Florida Home, showing that Debtor claimed his homestead exemption for tax purposes only two days before he filed his Chapter 7. *See* Exhibit 391A. While this is not, in isolation, fatal to Debtor's claim of domicile, and again, the Debtor claims another "innocent mistake" resulting in delay, the remainder of the tax history indicates that Debtor was not using the Florida Home as his primary residence during the entirety of the 730-day lookback period.

-16-

McCallan argues that he established his domicile in Florida some time during the summer of 2014, based on testimony that his children were enrolled in Florida schools beginning in the 2014 academic year, that he and his family joined a church in Florida, that his wife had a shop in Florida, that his elderly parents also live in Florida, while also pointing to the Trustee's exhibits as purported proof that he established a Florida domicile in 2014. While the Debtor's testimony regarding his family situation does indeed bolster his claim, it lacks the requisite magnitude to overcome Debtor's actions and inactions taken in conflict with his testimony as shown by the Trustee's documentary evidence.

The Trustee's evidence creates two problems for the Debtor. First, the Brevard County, Florida, tax records show that the mailing address for the Debtor was "17 Creston Terrace, Northport, New York" for the December 2014, June 2015, and September 2015 installment payments for the property taxes on the Florida Home. *See* Exhibit 391A. The first installment payment to list Debtor's mailing address as the Florida Home was the December 2015 installment payment; yet, notably, absent a claim of homestead exemption. *Id.* Again, Debtor's actions belie his testimony. Second, while the Debtor did list the Florida Home as his residence on the August 24, 2015 tax document with Brevard County, he did not claim a homestead exemption until November of 2016. Exhibit 391A.

Another strike against the Debtor is that he did not file a Declaration of Domicile with the State of Florida until September 8, 2015, well within the 730 days preceding the commencement of this case on November 18, 2016. *See* Exhibit 1. While this alone is not conclusive proof that

-17-

he was not domiciled in Florida prior to September 8, 2015, when considered in concert with the chorus of Debtor's actions and inactions, it deteriorates the strength of Debtor's testimony.

The Court concludes that the Debtor was not domiciled in Florida until September 7, 2016, which falls within the 730 days immediately preceding the commencement of this case.  Beyond repeated claims of innocent mistakes, Debtor has not explained the discrepancy between his Declaration, dated August 24, 2015, and the fact that he continued to pay Florida property taxes, without receiving a homestead exemption, until 2016.  Consequently, the Debtor may not assert a claim of exemptions under Chapter 222 of the Florida Statutes or the Florida Constitution.  The Trustee's objection is sustained insofar as the Debtor's inability to claim Florida exemptions.  The Trustee's objection is overruled, without prejudice, as to the objections lodged under 11 U.S.C. §§ 522(o) and (p) against Debtor's homestead exemption under the Florida Statutes and the Florida Constitution.  As discussed in Part II E, *infra,* the Trustee may reassert her objections if and when the Debtor claims an exemption under 11 U.S.C. § 522(d).  The Debtor's ability to assert a claim of exemption under Florida common law for tenancy by the entireties is discussed in Part II G, *infra*.

### D.  Debtor may not assert an extraterritorial Claim of Exemptions under New York law

As McCallan does not satisfy the requirement that he be domiciled in one state for the 730 days preceeding the date of his petition in bankruptcy, the court must next consider his domicile for the 180 days prior to the 730 day period prior to the date of his petition.  11 U.S.C. § 522(b)(3)(A).  As it is undisputed that McCallan was domiciled in New York for many years prior to his change of domicile to Florida, he was clearly domiciled in New York during the 180 day

-18-

period preceding the 730 day period preceding the date of the petition. The Court must next examine the exemption laws of New York to determine whether Debtor is eligible to assert a claim of exemption under New York law, while he is domiciled in Florida. In other words, does New York permit an extraterritorial claim of exemptions under its laws? *See In re Crandall*, 346 B.R. 220, 221 (Bankr. M.D. Fla. 2006). As the Court in *Crandall* noted, New York law does not allow extraterritorial use of exemptions; that is, New York exemptions are restricted to Debtors domiciled in New York at the filing of their bankruptcy petition. *See* N.Y. DEBT & CRED. § 282 (McKinney); *see also In re Crandall*, 346 B.R. at 221 ("[U]pon review of New York law, New York exemptions are limited to 'individual debtors domiciled in this state.'"). Thus, as there is no dispute that Debtor was not a New York domiciliary on November 18, 2016 (the date of the petition), he is ineligible to claim New York exemptions.

### E. Debtor may assert a Claim of Exemption under 11 U.S.C. § 522(d)

Having determined that Debtor is ineligible to claim either Florida or New York exemptions, the Court must determine what exemptions are available to the Debtor. *See In re Kelsey*, 477 B.R. 870, 878 (Bankr. M.D. Fla. 2012). The Debtor's ineligibility to claim Florida exemptions due to 11 U.S.C. § 522(b)(3)(A) and inability to claim New York exemptions extraterritorially triggers the so-called "savings clause" of the hanging paragraph of 11 U.S.C. § 522(b)(3), which states that "[i]f the effect of the domiciliary requirement under subparagraph (A) is to render the debtor ineligible for any exemption, the debtor may elect to exempt property that is specified under subsection (d)."

Despite Florida's status as an "opt out" state, Debtor is entitled to assert a claim of exemption under 11 U.S.C. § 522(d). *In re Crandall*, 346 B.R. at 221 (Debtor who was ineligible to claim either Florida or New York exemptions was eligible for federal exemptions under § 522(d) despite Florida's "opt out" status.); *see also In re Kelsey*, 477 B.R. at 878 (Debtor who was ineligible for Colorado or Florida exemptions was eligible for federal exemptions.). Accordingly, the Debtor is given 30 days to file an Amended Schedule C in order to assert a claim of exemption under 11 U.S.C. § 522(d) for the property described in Part II C, *supra*. The Trustee shall then be given 14 days to file any objection to the Debtor's federal exemptions.

## F. 26 U.S.C. § 529 College Savings Plans

The Court next turns its attention to the Debtor's three 529 college savings plans [hereinafter "529 Plans"]. Debtor has claimed an exemption under Florida law and an exclusion under 11 U.S.C. § 541(b)(6). *See* Doc. 178 at 15. As discussed in Part II B, *supra*, the filing of petition under Chapter 7 creates an estate consisting of the debtor's interests in property. However, 11 U.S.C. § 541(b) enumerates certain property interests that do not become property of the bankruptcy estate. The Debtor contends that § 541(b)(6) excludes the funds currently held in Debtor's three 529 Plans. The statute states that:

> (b) Property of the estate does not include—
>
> [ . . . ]
>
>> (6) funds used to purchase a tuition credit or certificate or contributed to an account in accordance with section 529(b)(1)(A) of the Internal Revenue Code of 1986 under a qualified State tuition program (as defined in section 529(b)(1) of such Code) not later than 365 days before the date of the filing of the petition in a case under this title, but—

(A)  only if the designated beneficiary of the amounts paid or contributed to such tuition program was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were paid or contributed;

(B)  with respect to the aggregate amount paid or contributed to such program having the same designated beneficiary, only so much of such amount as does not exceed the total contributions permitted under section 529(b)(6) of such Code with respect to such beneficiary, as adjusted beginning on the date of the filing of the petition in a case under this title by the annual increase or decrease (rounded to the nearest tenth of 1 percent) in the education expenditure category of the Consumer Price Index prepared by the Department of Labor; and

(C)  in the case of funds paid or contributed to such program having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,825[.]

11 U.S.C. § 541(b)(6).[9]

Wilkins has objected to Debtor's claim of exemption on three 529 Plans for his children on the grounds that the plans "do not meet the requirements of F.S.A. § 222.22."[10]  Doc. 51 at 3. Wilkins further contends that funds deposited into these plans are "proceeds from the Allegro fraud" committed by Debtor's former enterprises.  Doc. 285 at 13.  Wilkins has not claimed that

---

[9] The dollar figure indicated in 11 U.S.C. § 541(b)(6)(C) is subject to adjustment under § 104.  The dollar amount listed in § 541(b)(6)(C) as of the date of Debtor's petition was $6,425.

[10] Section 222.22 provides that:

Moneys paid into or out of, the assets of, and the income of any validly existing qualified tuition program authorized by [§] 529 of the Internal Revenue Code of 1986, as amended, including, but not limited to, the Florida Prepaid College Trust Fund advance payment contracts under [§] 1009.98 and Florida Prepaid College Trust Fund participation agreements under [§] 1009.981, are not liable to attachment, levy, garnishment, or legal process in the state in favor of any creditor of or claimant against any program participant, purchaser, owner or contributor, or program beneficiary.

F.S.A. § 222.22(1).

the three plans do not otherwise satisfy the requirements to qualify as "college savings plans" under 26 U.S.C. § 529, or that the Debtor's contributions exceeded any statutory maximums.

While the Debtor did assert a claim of exemption under Florida law, he is not eligible to claim Florida exemptions as discussed in Part II C, *supra*. In practical terms, the Debtor's inability to exempt the funds under Florid law is irrelevant because "[s]ection 541(b)(6), added by BAPCPA, expressly excludes, with certain exceptions, Section 529 accounts from property of the estate." *In re Addison*, 540 F.3d 805, 820 (8th Cir. 2008). Therefore, "[t]he question at bar is not whether the 529 plans are exempt; rather, are such plans excluded from [Debtor's] bankruptcy estate under § 541(b)(6)?" *In re Hennessy*, 526 B.R. 806, 811 (Bankr. D. Minn. 2015). As an "exclusion" rather than an "exemption," § 541(b)(6) acts to withhold property from the estate instead of withdrawing property already in the estate. Additionally, "the express language of 11 U.S.C. § 541(b)(6) does not limit the exclusion from property of the estate to the plan itself, but rather the 'funds contributed to' the 529 plan." *Matter of Dunston*, 566 B.R. 624, 633 (Bankr S.D. Ga. 2017).

The exclusionary powers of § 541(b)(6) are not limitless, as "[t]he natural reading of § 541(b)(6) provides an exclusion from property of the estate for 529 accounts on a sliding scale." *In re Bourguignon*, 416 B.R. 745, 752 (Bankr. D. Idaho 2009). This "sliding scale" consists of three time periods: (1) the 365 days immediately preceding the filing of debtor's petition, (2) between 365 and 720 days immediately preceding the filing of the petition, and (3) more than 720 days before the debtor filed the petition. *See id*.

The first time period is the least forgiving to the debtor because "[a]ny amounts contributed [to the 529 plan] within a year of bankruptcy are not excluded at all from property of the estate." *Id*. at 752-53 (footnote omitted).  Sliding up the scale, "contributions made between 365 and 720 days prior to bankruptcy are excluded from property of the estate to the extent below [the § 541(b)(6)(C) limit] but any such contributions over [said limit] in that same time frame remain property of the estate."  *Id*. at 752 (footnote omitted).  Finally, "contributions made to a 529 account more than 720 days prior to bankruptcy are fully excluded from property of the estate." *Id*. (footnote omitted).

At the November 8, 2018, hearing, the Debtor argued that the 529 plans were not property of the estate pursuant to 11 U.S.C. § 541(b)(6).  *See* Doc. 282, Transcript of November 8, 2018 Evidentiary Hearing at 9.  Debtor further elaborated on this argument in his post-trial brief, claiming that "all significant funds transferred into these three accounts were deposited more than 2 years preceding the filing of the bankruptcy petition."  Doc. 286 at 19.

During the two-day trial, Wilkins' expert witness and forensic accountant, Mr. Allen Carroll, did not address the Debtor's 529 Plans, or his contributions to said plans, in any way.  The Debtor offered the only testimony on the subject:

> Q:  [FRITZ] Would you say that the significant amount of your contributions to your children's 529 predated 2007?

> A:  [McCallan]  Yes.  Absolutely.

> Q       When did you first open your -- the first of the 529s?

A       It was in 1999, one year after my daughter Nicole was born.

Doc. 282-1, Transcript of November 9, 2018 Evidentiary Hearing at 51.

The only documentary evidence introduced at trial consisted of a financial statement showing a $10,000 contribution on February 1, 2010 to the 529 Plan for the benefit of Timothy J. McCallan.[11]  *See* Ex. 452J.  Further, in Wilkins' Proposed Findings of Fact, the only mention of any funds in any of the Debtor's three 529 Plans is the February 1, 2010, contribution of $10,000, which the Trustee asserts are "proceeds from the Allegro fraud and is therefore property of the estate subject to collection."  *See* Doc. 285 at 13 (citation omitted).

Wilkins has not shown any contributions to any of the three accounts within the 720-day lookback period; as such, the funds held in the three 529 Plans are not property of the Debtor's bankruptcy estate under 11 U.S.C. § 541(b)(6).  Accordingly, the Debtor cannot assert any claim of exemption under § 522 because only property of the estate is exemptible.  *See Owen*, 500 U.S. at 308 ("No property can be exempted (and thereby immunized), however, unless it first falls *within* the bankruptcy estate.  Section 522(b) provides that the debtor may exempt certain property 'from property of the estate', obviously, then, an interest that is not possessed by the estate cannot be exempted.") (emphasis in original); *see also In re Sanon*, 403 B.R. 737, 740 (Bankr. M.D. Fla. 2009) ("It is elementary and beyond peradventure that only properties which are property of the Debtor's estate may be claimed under Section 522 of the Bankruptcy Code as exempt.").  Wilkins' objection as it pertains to the Debtor's three 529 Plans is sustained insofar as the Debtor is unable

---

[11] This is the Debtor's son.

to assert a claim of exemptions on said plans; however, the Court finds that the funds contributed to Debtor's 529 Plans are excluded from the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(b)(6)(C).

## G. Tenancy by the Entireties Property

Next, the Court addresses the Debtor's claim of exemptions under 11 U.S.C. § 522(b)(3)(B), which provides that a debtor may exempt:

> any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt under applicable nonbankruptcy law[.]

The Debtor has claimed the Florida Home, household goods and furnishings, a Wells Fargo bank account, and an irrevocable family trust as exempt entireties property under Florida common law. *See* Doc. 178. The Trustee objects contending, among other things, because the McCallan acquired his property with the proceeds of ill-gotten gains from his fraudulent debt management business, that she has an equitable lien which defeats his claim of exemption and the entireties nature of his property.

## 1. Tenancy by the Entireties Generally

First, the Court assesses whether the Debtor has satisfactorily established that he indeed holds these various items of property as entireties property with his spouse. Property owned as entireties property is subject to the claims of creditors "of both the husband and wife, jointly." *Beal Bank, SSB v. Almand and Associates*, 780 So.2d 45, 53 (Fla. 2001); *see also Havoco of*

-25-

*America, Ltd. v. Hill*, 197 F.3d 1135, 1139 (11th Cir. 1999) ("[P]roperty held by a debtor as a tenant-by-the-entireties is exempt from the claims of individual creditors in bankruptcy under Florida common law."). Additionally, "the property is not divisible on behalf of one spouse alone, and therefore it cannot be reached to satisfy the obligation of only one spouse." *Beal Bank*, 780 So.2d at 53. Entireties property is also vulnerable to creditors where the property was acquired fraudulently. *See Havoco*, 197 F.3d at 1139 ("[W]hen tenancy-by-the-entireties property is created via fraudulent conveyance, it may be avoided as such.")

Under Florida law, "[w]here real property is acquired specifically in the name of a husband and wife, it is considered to be a 'rule of construction that a tenancy by the entireties is created, although fraud may be proven.'" *Beal Bank*, 780 So.2d at 54 (quoting *First Nat. Bank of Leesburg v. Hector Supply Co.*, 254 So.2d 777, 780 (Fla. 1971)). The *Beal Bank* Court further held that "[i]n the case of ownership of real property by husband and wife, the ownership in the name of both spouses vests title in them as tenants by the entireties." *Id.* (citing *Losey v. Losey*, 221 So.2d 417, 418 (Fla. 1969)); *see also In re Estate of Suggs*, 405 So.2d 1360, 1361 (Fla. 5th DCA 1981) ("A conveyance to spouses as husband and wife creates an estate by the entirety in the absence of express language showing a contrary intent.").

Relevant case law also indicates a presumption in favor of jointly held personal property as entireties property. The Florida Supreme Court in *Beal Bank*, when tasked with determining whether bank accounts jointly owned by spouses enjoy the same presumption as jointly owned real property held that:

> Although we understand the considerations that originally led to this Court's decision not to adopt a presumption of tenancy by the entireties in personal property similar to that in real property, we conclude that stronger policy considerations favor allowing the presumption in favor of a tenancy by the entireties when a married couple jointly owns personal property.

*Beal Bank*, 780 So.2d at 57.

The list does not stop at bank accounts; in *Beal Bank*'s wake, courts have interpreted Florida's entireties protections broadly in favor of the exemption claimant. *See, e.g., In re Himmelstein*, 203 B.R. 1009 (Bankr. M.D. Fla. 1996) (allowing an entireties exemption on jointly owned stock); *In re Collins*, 600 B.R. 108 (Bankr. M.D. Fla. 2019) (allowing an entireties exemption on a jointly owned boat trailer); *In re Hinton*, 378 B.R. 371 (Bankr. M.D. Fla. 2007) (allowing an entireties exemption on a federal income tax refund check from a jointly filed tax return).

The largest and most valuable property claimed as entireties property is the Florida Home. At trial, the Debtor introduced a general warranty deed showing Debtor and his non-filing spouse as joint owners of the Florida Home. (Deft. Exhibit 4). This is sufficient to create a presumption that the Florida Home is owned by Debtor and his spouse as entireties property. *See Beal Bank*, 780 So.2d at 54.

Likewise, the Debtor offered testimony as to the various household furnishings claimed as exempt entireties property:

> Q: [FRITZ]   We're going to talk about the furnishings in the home.  There was some discussion about who paid for them, but it -

-27-

- just to -- when you purchased from whatever source those furnishings, did you have -- did you purchase them together with your wife?

A: [McCallan] Yes, I did.

Q        Okay. And at the time -- since the purchase of those items, have they always remained joint property?

A        Yes.

Doc. 282-1, Transcript of November 9, 2018 Evidentiary Hearing at 51-52.

Accordingly, the Debtor has met his threshold to establish a presumption that the various household furnishings claimed on Schedule C as exempt entireties property are indeed entireties property. As the Debtor has established a presumption of ownership by a tenancy by the entireties, the burden now shifts "to the creditor 'to prove by the preponderance of the evidence that one of the necessary unities did not exist' *when the spouses acquired the property at issue*." *In re Aranda*, No. 08-26059-BKC-PGH, 2010 WL 5018320 *3 (Bankr. S.D. Fla. Dec. 3, 2010) (italics added) (quoting *Cacciatore v. Fisherman's Wharf Realty Ltd. P'ship*, 821 So.2d 1251, 1255 (Fla. 4th DCA 2002)). Wilkins argues that the Debtor lacks the unities of possession and title on the grounds that the Debtor acquired equity in the Florida Home using fraudulent proceeds. Doc. 285 at 14. However, Wilkins has not challenged the existence of the unities when the Debtor and his wife acquired the Florida Home in 2004; therefore, the Debtor's presumption prevails.

It is also noteworthy that the Debtor claimed an entireties exemption on an irrevocable spendthrift trust and a Wells Fargo bank account with a $0 balance on Schedule C. *See* Doc. 178

Case 17-30961    Doc 364    Filed 05/07/21    Entered 05/07/21 16:26:52    Desc Main
Document        Page 28 of 42

at 14-16.  The Debtor did not offer testimony to support that claim at trial, introduce any documentary evidence supporting his claim, nor did he address their nature as entireties property in his post-trial brief.  *See* Doc. 286.  To that end, the Debtor has not presented sufficient evidence to enjoy the *Beal Bank* presumption of validity as to the entireties nature of the trust and the bank account.  For this reason, the Court finds that the Debtor has a tenancy by the entireties interest in the Florida Home and the household furnishings listed on Schedule C, but not as to the Wells Fargo bank account or the spendthrift trust.

### i. 11 U.S.C. §§ 522(o) and (p) do not apply to Tenancies by the Entireties

Wilkins' vanguard objection to the Debtor's entireties exemption on the Florida Home is that the Debtor obtained his interest in the property through ill-gotten gains, thus implicating 11 U.S.C. §§ 522(o) and (p).  These objections fail as a matter of law.  As the court noted in *Aranda* noted, "[b]oth [11 U.S.C. §§ 522(o) and (p) apply only to exemptions claimed under § 522(b)(3)(A)," and are thus ineffective against entireties exemptions claimed under § 522(b)(3)(B).  2010 WL 5018320 *2; *see also In re Davis*, 403 B.R. 914, 919 (Bankr. M.D. Fla. 2009) ("[Section] 522(o) does not affect a debtor's claim of exemption under tenancy by the entireties."); *In re Buonopane*, 359 B.R. 346, 348 (Bankr. M.D. Fla. 2007) ("[S]ection 522(p) does not limit the Debtor's claim of exemption based on tenancy by the entirety."); *In re Hinton*, 378 B.R. at 380 ("Section 522(o) begins with the limiting language:  'For purposes of subsection (b)(3)(A).'  Thus, by its explicit terms, Section 522(o) applies only to Bankruptcy Code Section 522(b)(3)(A), and not, as the plaintiffs assert, to Section 522(b)(3)(B).") (citation omitted).

Accordingly, Wilkins' objections to Debtor's entireties exemptions on the Florida Home on the grounds of §§ 522(o) and (p) are due to be overruled as a matter of law.

### ii. 11 U.S.C. § 522(b)(3)(A) does not apply to Tenancies by the Entireties

Wilkins also lodged an objection to Debtor's claim of exemption for the Entireties Property on the theory that because the domiciliary requirement of 11 U.S.C. § 522(b)(3)(A) rendered Debtor ineligible to claim Florida exemptions, he is also ineligible to claim an entireties exemption under Florida common law. Again, the Bankruptcy Code and reported case law do not support Wilkins' position. As the court stated in *Zolnierowicz*, "[t]he domicile provisions that are set forth in subsection (A) of § 522(b)(3) do not apply to a claim of exemption for entireties property under subsection (B) of § 522(b)(3)." 380 B.R. 84, 87 (Bankr. M.D. Fla. 2007); *see also In re Schwarz*, 362 B.R. 532, 534-35 (Bankr. S.D. Fla. 2007).[12]

Therefore, Wilkins' objection to Debtor's entireties exemptions based on the domiciliary requirement of § 522(b)(3)(A) is due to be overruled as a matter of law.

---

[12] The *Schwarz* Court held that:

> Florida real property owned by a Florida-domiciled debtor is exempt from administration as property of the estate regardless of when the debtor became a Florida domiciliary if the debtor had, immediately before the commencement of the case, an interest in that property held in a tenancy by the entireties with a spouse.

362 B.R. at 536.

## 2. The Trustee's Equitable Lien

Having determined that McCallan holds his Florida residence and the furnishings as tenants by the entirety with his wife, the Court must next determine whether the Trustee holds, as she contends, an equitable lien on that property as it was acquired with ill-gotten gains from a fraudulent debt management scheme.

### i. Equitable Liens on Homestead Property Generally

Florida law recognizes such a lien when the property is acquired with "funds obtained through fraud or egregious conduct used to invest in, purchase, or improve the homestead." *Havoco of America, Ltd. v. Hill*, 790 So.2d 1018, 1028 (Fla. 2001). This exception to the general rule "lift[s] the veil of protection provided by the homestead exemption." *Hirchert Family Trust v. Hirchert*, 65 So.3d 548, 551 (Fla. 5th DCA 2011). In addition, the protections provided by the Florida Constitution do not apply to property purchased with fraudulently obtained funds. *LaBelle v. LaBelle*, 624 So.2d 741, 742 (Fla. 5th DCA 1993).

The Eleventh Circuit, in a case that is analogous to the case at bar, upheld the decision of a Florida Bankruptcy Court which imposed an equitable lien in an action brought by a Trustee in Bankruptcy against a debtor who had purchased homestead property with the proceeds of a fraudulent ponzi scheme. *Fin. Fed. Title & Trust v. Kozyak (In re Fin. Fed. Title and Tr., Inc.)*, 347 F.3d 880 (11th Cir. 2003). "The rule stated in *Jones* that a homestead cannot be employed as an instrumentality of fraud has been restated by the Supreme Court of Florida in numerous cases to impose an equitable lien against homestead property." *Id*. at 887 (citing *Jones v. Carpenter*, 90 Fla. 407, 106 So. 127 (Fla. 1925))(cases cited in *Kozyak* omitted). In another case involving

Case 17-30961    Doc 364    Filed 05/07/21    Entered 05/07/21 16:26:52    Desc Main
Document      Page 31 of 42

property acquired by fraud, the Supreme Court of Florida approved the imposition of an equitable lien where the husband forged his wife's signature when granting the lender a mortgage on their homestead. *Palm Beach Sav. & Loan Ass'n., F.S.A. v. Fishbein*, 619 So.2d 267 (Fla. 1993); *see also Fed. Trade Comm'n. v. Marcus*, Case No. 20-10832, 2021 WL 807528 (11th Cir. Mar. 3, 2021) (unpublished decision); *Fed. Trade Comm'n. v. Am. Precious Metals, LLC*, 726 Fed.Appx. 729 (11th Cir. 2018) (unpublished decision); *Hecker v. Kokomo Spring Co.*, 264 Fed.Appx. 786 (11th Cir. 2008) (unpublished decision).

### ii. Equitable Liens and Tenancy by the Entireties

As Florida law provides for the imposition of an equitable lien on property acquired by fraudulent means, the question becomes whether McCallan's conduct here rises to a level which would overcome the general rule or protecting property held as tenants by the entirety from the creditors of only one of the two spouses.

While Florida common law generally protects property jointly held by spouses in a tenancy by the entireties, it does not shield property that was acquired or improved upon through fraud. The most illustrative example bears a striking resemblance to the case at bar, albeit on a slightly smaller scale. *See Fed. Trade Comm'n v. Life Mgmt Servs. of Orange County, LLC*, Case No. 6:16-cv-982-Orl-41TBS, 2019 WL 1093023 at \*10 (M.D. Fla. Jan. 24, 2019).

In *Life Management*, one of the defendants, Kevin Guice, orchestrated a fraudulent telemarketing debt settlement scheme from Florida using multiple business entities to control different aspects of the operation. *Fed. Trade Comm'n v. Life Mgmt Servs. of Orange County, LLC*, Case No. 6:16-cv-982-Orl-41GJK, 2021 WL 307357 at \*1 (M.D. Fla. Jan. 29, 2021). Shortly

-32-

after the FTC brought suit against Mr. Guice and his various business entities involved in the scam, the court appointed a receiver to account and marshal the assets of the defendants. *Id.* Soon afterward, the court granted summary judgment against Mr. Guice and his corporate defendants, jointly and severally, in the amount of $23,099,877.02; judgment was not entered against Kevin Guice's wife, Shannon Guice. *Fed. Trade Comm'n v. Life Mgmt Servs. of Orange County, LLC*, 350 F.Supp. 3d 1246, 1274 (M.D. Fla. 2018).

When the receiver moved to compel disgorgement of Mr. Guice's assets purchased by Mr. & Mrs. Guice with funds traced to proceeds from his fraudulent enterprise, Guice opposed the motion on the grounds that they held their Orlando, Florida home as tenants by the entirety. *Life Mgmt Servs.*, 2019 WL 1093023 at *9. The court rejected Guice's argument and imposed both a constructive trust and an equitable lien "on the homestead and any other property the Guices own as tenants by the entirety," finding that "[t]he funds the Guices used to purchase their property was tainted. There is a difference between taking legitimately acquired property as a sanction and imposing a constructive trust on property that was not legitimately acquired." *Id.*

Before the receiver could execute on the equitable lien, Mrs. Guice filed for bankruptcy protection, which temporarily stalled the receiver's recovery efforts. *Life Mgmt Servs.,* 2021 WL 307357 at *2. After the receiver obtained relief from the automatic stay in Mrs. Guice's bankruptcy case, he attempted to enforce the Disgorgement Order by taking possession of the Guice's Orlando home and liquidating it. *Id.* Due to the Guices' continued noncompliance with

Case 17-30961    Doc 364    Filed 05/07/21    Entered 05/07/21 16:26:52    Desc Main
Document      Page 33 of 42

the Disgorgement Order, the District Court ultimately ordered the U.S. Marshals to accompany the receiver and place in possession of the Guices' Orlando Home. *Id.* at *5.[13]

### iii.  McCallan acquired his Florida residence using the proceeds of ill-gotten gains from his fraudulent debt management scheme

McCallan and his wife purchased the Florida residence at 6730 Still Point Drive, Melbourne, Florida, in 2004.  In 2005 and 2006 he paid approximately $200,000, all but $5,000 of which was for interest.  He paid $166,171.10 in 2007, $508,504.17 in 2008 and $1,587,895.75 in 2009.  (Doc. 282, pp. 61- 87)(Tr. Nov. 9, 2018) *see also* (Tr. Ex. 419A, 419B).  The Trustee called forensic accountant Allen Carroll who traced the money business entities controlled by Timothy McCallan, through a number of bank accounts and through several entities owed or controlled by Timothy McCallan, to pay the mortgage on the Melbourne, Florida property.  Carroll testified that in some instances money was transferred into a bank account in McCallan's name and the mortgage paid from there, while in other instances, PHH Mortgage was paid directly from business entities such as Seton and Intermark, which have been shown to be under the control of McCallan and through which proceeds of the fraudulent business activity passed.  The sources of these funds were various entities controlled by the Debtor, which were a part of his fraudulent debt management scheme.

The Trustee's lawyer examined McCallan regarding the source relating to the payment of his mortgage on the Florida Home:

---

[13] Kevin Guice has appealed the District Court's Order of January 21, 2021 to the Eleventh Circuit on March 1, 2021 bearing case number 21-10688.

Q [Mr. Olen]: ... what this document shows is that between April 24 and November 12 of 2009, Intermark made mortgage payments on behalf of you and your wife of approximately – let me see. Over a million dollars. Are you aware of that?

A [Debtor]: Yes.

Q: And Intermark made those mortgage payments directly to Merrill Lynch Mortgage Company. Correct?

A: Uh-huh. Okay.

Q: Are you aware of that?

A: I'm aware of that.

Q: Why did one of your companies pay over $1 million of mortgage payments for you and your wife?

A: It shows – it has a distribution here.

Q: That's not the –

A: It says –

Q: question.

-35-

A:  Tim's distribution.

Q:  That's not the question.  Why did you have Intermark send the money directly to the mortgage company instead of taking distributions, and then y'all writing the checks to the mortgage company?  Why was Intermark the one paying the money directly to the mortgage company?

A:  That was the procedure that they laid out.  I just asked them to get the money to the mortgage company.

Q:  They being people who worked for you?

A:  The comptroller.

Q:  The fact is that you wanted these mortgage payments made through Intermark, so that the – the fact of these payments being made would be hid from creditors of yours and Seton and Americorp.  Right?  That what was –

A:  No

Q:  –really going on.

A:  No, that's not true.

Doc. 282-1, Transcript of November 9, 2018 Evidentiary Hearing at 6-7.

The Trustee, her lawyers and her forensic accountant made considerable efforts to untangle

McCallan's affairs and determine where the money came from to pay the mortgage on the Florida

residence.  In addition to McCallan's dissembling, an example of which is set out above, he used several business entities, many of which at first glance appeared to be unrelated, as well as many bank accounts and financial accounts, to obscure the truth underlying McCallan's affairs. McCallan admitted that he and his businesses has used more than 150 bank accounts which were used by McCallan in some fashion in his fraudulent debt management business or in an effort to conceal his property and money from the Trustee.

The Trustee established, through Alan Carroll's testimony, that McCallan paid off his Florida residence, and its contents, with the proceeds of his fraudulent debt management scheme. On February 14, 2008, Seton Corp., which is entirely owned by the Debtor, wired $200,000 to Debtor's Merrill Lynch account.  Ex. 485.  Six days later, Debtor made a $150,000 payment to PHH Mortgage from the same Merrill Lynch account.  *Id*.  On May 1, 2008, Seton Corp. transferred $30,000 into Debtor's Bank of America account ending in 7480 [hereinafter "BOA Account"].  *Id*.  Debtor then paid $30,000 from the BOA Account to PHH on May 6, 2009.  Then, on March 31, 2009, Seton Corp. transferred $50,000 into Debtor's BOA Account.  *Id.*  Eight days later, Debtor made a $50,000 payment to PHH with funds from his BOA Account.  *Id.*

Additionally, Mr. Carroll was able to source an additional $1,072,000 paid by Intermark, another entity entirely owned by McCallan, to PHH Mortgage during 2009, as evidenced by the following exchange:

> Q [Ms. Tufts]: And I'm sorry, Mr. Carroll, let me repeat my question to you.  What does Trustee's Exhibit 500 reveal about which company paid the Florida mortgage for each blue entry in Trustee's Exhibit 485?

Case 17-30961    Doc 364    Filed 05/07/21    Entered 05/07/21 16:26:52    Desc Main
Document    Page 37 of 42

A [Mr. Carroll]: Yes, Your Honor, on Trustee's Exhibit 500, I was able to, on those payments out of Intermark that were recorded as distributions, the payments on the Florida mortgage, I was able to relate those to Trustee's Exhibit 485 as being paid by Intermark. The Florida mortgage payments being paid by Intermark that are all identified there in blue.

Q: If we were to total the Florida mortgage payments reflected on Trustee's Exhibit 500, those audit papers, which are in blue in Trustee's Exhibit 485, from April, 2009 to November, 2009, when the mortgage was paid off, how much of the Florida mortgage was paid by Intermark during that time period?

A: Slightly over a million dollars. It's about a million, $72,000. I'd have to look at my work papers for the exact number. But it's about – slightly over a million dollars.

Q: Mr. Carroll, did you find any evidence that money paid by Intermark between April, 2009 and November, 2009, as reflected in the blue entries on Trustee's Exhibit 485, can be sourced to Seton?

A: Yes.

Doc. 282-1, Transcript of November 9, 2018 Evidentiary Hearing at 73-74.

Based on Allen Carroll's testimony and expert analysis, the Court finds that virtually all of the money used to purchase the Melbourne, Florida residence and the contents were the proceeds of ill-gotten gains from the Debtor's fraudulent debt management scheme.

-38-

### iv. Wilkins is Entitled to an Equitable Lien on the Florida Home and its Contents

In related proceedings, this court entered a money judgment against McCallan for fraud in the amount of $102,949,220.72. *Wilkins v. AmeriCorp (In re Allegro Law, LLC)*, 545 B.R. 675 (Bankr. M.D. Ala. 2016). This Court stated that "this is an extraordinary case of fraud on a massive scale that was perpetrated by Defendant Timothy McCallan on thousands of victims." *Id.* at 681. In a decision handed down by the District Court in earlier proceedings involving McCallan's debt management business, it described his business as follows:

> Allegro's business venture was debt elimination. The Trustee describes the scheme in the Complaint as, "at best, an aggressive form of debt management in which consumers stop paying all of their unsecured debts in an attempt to have their creditors agree to a reduced settlement." At worst, it is personal economic suicide; debtors who are already fighting to keep themselves from sinking are strapped to an anchor on the illusory promise that the water will recede. The very likely outcome of pursuing debt elimination in this fashion is a creditor's decision not to accept any settlement offers. The consumer is left with more money owed—due to increased interest, late fees, and penalties on accounts not being paid—and lower credit scores for their induced delinquency. In addition, the debt settlement firms take a hefty cut as fees of whatever payments the consumer sends directly to them.

*AmeriCorp v. Hamm*, No. 2:11-cv-677-MEF, 2012 WL 1392927 *1 (M.D. Ala. Apr. 23, 2012) (internal citations omitted).

There are four facts working together which mandate the conclusion that McCallan has exceeded the threshold necessary to impose an equitable lien. First, the sheer volume of the fraud, more than $100,000,000 taken from its victims, is striking. Second, the number of victims is in

Case 17-30961    Doc 364    Filed 05/07/21    Entered 05/07/21 16:26:52    Desc Main
Document        Page 39 of 42

the thousands. Third, the length of the fraudulent activity. McCallan's fraud spanned decades. Fourth, McCallan targeted low income individuals and struck when they were vulnerable. He offered assistance to people in need of help with their debts but rather than helping them, he took their money, did not pay their debts, and left them in far more dire straits than when they came for help. Considering the magnitude and the harm done to victims, this case is one of the most compelling imaginable. The damage done by the Debtor more than quadruples the extent of Kevin Guice's operation.

Most importantly, Wilkins has traced over $1.5 million from various arms of Debtor's fraudulent enterprise into Debtor's Florida Home. This property, like the Guices' Orlando home in *Life Management Services*, is tainted. The Debtor cannot be allowed to unjustly enrich both himself and his family with the fruits of his fraudulent debt settlement scheme. For these reasons, the Trustee shall be awarded an equitable lien on the Debtor's Florida residence and the contents of the residence.

### H. The Trustee' Fraudulent Conveyance Suit Against Jeanne McCallan

The instant proceeding is a contested matter brought by the Trustee in bankruptcy against Timothy McCallan, the Debtor in this case. In a separate adversary proceeding, the Trustee has brought an adversary proceeding alleging fraudulent conveyances from Timothy McCallan to Jeanne McCallan totaling more than $10,000,000. *See* Adv. Pro. No. 18-3084, Docs. 1 & 10. This Court has entered an order in that proceeding denying her motion for summary judgment, leaving the proceeding ready for trial. If Jeanne McCallan ultimately loses a money judgment on the Trustee fraudulent conveyance actions, her position *vis a vis* the Trustee will most likely be harmed.

Whether the Trustee will elect to proceed against McCallan's Florida residence and foreclose her equitable lien in advance of the trial of Adversary Proceeding 18-3084 is up to her. At this stage, the Court finds it significant that the Trustee has alleged fraudulent conveyances by McCallan to his wife, apparently using many of the same structures used to pay down the mortgage on his home. In the instant proceeding, the Court has disallowed McCallan's claim of exemption. It anticipates further action.

### III.  Conclusion

In this matter, the Court has ruled upon the Trustee's objection to the Debtor's claim of exemption. The Court acknowledges that this is not the end of the proverbial road, but believes that McCallan is running out of pavement. For the foregoing reasons, it is hereby

**ORDERED** that the Debtor is ineligible to claim exemptions under Chapter 222 of the Florida Statutes and/or the Florida Constitution; it is further

**ORDERED** that the Trustee's Objection to Debtor's Claim of Exemptions is **SUSTAINED** to the extent the Debtor claimed exemptions under Chapter 222 of the Florida Statutes and/or the Florida Constitution; it is further

**ORDERED** that the Debtor is ineligible to claim New York exemptions; it is further

**ORDERED** that the Debtor is hereby given 30 days from today to file an Amended Schedule C asserting federal exemptions under 11 U.S.C. § 522(d); it is further

**ORDERED** that Wilkins shall have 14 days after Debtor files his Amended Schedule C to object to Debtor's federal exemptions; it is further

Case 17-30961    Doc 364    Filed 05/07/21    Entered 05/07/21 16:26:52    Desc Main
Document      Page 41 of 42

**ORDERED** that the funds contributed to Debtor's three 529 College Savings Plans are not property of the Debtor's bankruptcy estate; it is further

**ORDERED** that the Florida Home and the jointly owned furnishings therein and held by the Debtor and his spouse as tenants by the entireties; it is further

**ORDERED** that the Debtor has failed to establish that the Wells Fargo bank account and the spendthrift trust are entireties property; it is further

**ORDERED** that Wilkins' Objection to Debtor's Claim of Exemptions is **OVERRULED** as to Wilkins' Objections under 11 U.S.C. §§ 522(o) & (p) against Debtor's property owned through a tenancy by the entirety; it is further

**ORDERED** that Wilkins is granted an equitable lien on the Florida Home and its furnishings.

    Done this 7th day of May, 2021.

William R. Sawyer
United States Bankruptcy Judge

c: Debtor
   Michael A. Fritz, Sr., Attorney for Debtor
   Carly B. Wilkins, Trustee
   Steve Olen, Attorney for Trustee
   Bankruptcy Administrator